# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **S.J., an individual,** | **Case No.: 2:26-cv-00517-ALM-KAJ** |
| **Plaintiff,** | **JUDGE:** |
| | **MAGISTRATE JUDGE:** |
| **v.** | |
| **WYNDHAM HOTELS & RESORTS, INC.;** **WYNDHAM HOTEL GROUP, LLC;** **ANJU INC.** | **Demand for Jury Trial** |
| **DOES 1-10,** | |
| **Defendants** | |

1

## PLAINTIFF'S FIRST AMENDED COMPLAINT

### INTRODUCTION

1. Plaintiff, S.J., an individual, files this civil lawsuit to seek compensation for the harms and losses she sustained as a result of being a victim of sex trafficking that occurred from the years 2014 through 2017, when she was 16 through 19 years of age. For years, Plaintiff was subjected to untold atrocities, including rape, verbal and physical attacks, humiliation, fear, and sexual assault at hotels owned, operated, maintained, and controlled by the hotel defendants (and their agents and employees) named in this case.

2. Plaintiff was trafficked in hotels owned, operated, and managed by Wyndham Hotels & Resorts, Inc.; Wyndham Hotel Group, LLC; Anju Inc. Plaintiff's trafficker rented hotel rooms for the purpose of engaging in sex trafficking.

3. As discussed herein, the defendants derived a financial benefit from widespread use of their hotel properties for sex trafficking, including the trafficking of Plaintiff. Despite obvious and apparent signs of sex trafficking, these defendants continued renting hotel rooms to Plaintiff's traffickers and operated the hotels in a way that enabled sex trafficking, including by creating a haven where traffickers could operate without disruption from hotel staff and with minimal risk of detection and traceability. Thus, these defendants are civilly liable to Plaintiff pursuant to federal anti-trafficking laws and statutory remedies.

### PARTIES

4. Plaintiff is a natural person, currently 27 years of age, who is a resident and citizen of Louisville, Kentucky.

5. Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16). a. Due to the sensitive and intimate nature of the issues, Plaintiff requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to

proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[1]

6. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[3] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[4]

7. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

8. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[5]

9. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties

---

[1] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[2] Fed. R. Civ. P. 10(a).

[3] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); James v. Jacobson, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[4] Fed. R. Civ. P. 26(c).

[5] *Does I thru XXII*, 214 F.3d at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

10. Defendant Wyndham Hotels & Resorts, Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. It does business in a systematic and continuous manner throughout Ohio, including this District and Division.

11. Defendant Wyndham Hotel Group, LLC is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. It does business in a systematic and continuous manner throughout Ohio, including this District and Division.

12. Anju Inc. is a Tennessee Corporation. It owned and operated the Days Inn at 3839 Elvis Presley Boulevard, Memphis, Tennessee until approximately 2023, and during all of the time that Plaintiff was trafficked there.

13. The true names and capacities of Defendants DOES 1–10 are persons or entities whose true names, identities, and forms are currently unknown to Plaintiff. Plaintiff does allege that the principals and members of the Andrews-Ashkar defendants are responsible for the acts alleged herein, including under an alter-ego theory. Plaintiff will seek leave to amend this Complaint, as appropriate, to allege the true names and capacities of these fictitiously named Defendants when they are ascertained. Plaintiff is informed and believes, and thereupon alleges, that each of the fictitiously named Defendants DOES 1–10 is responsible for the conduct alleged in this Complaint and that, through their conduct, these fictitiously named Defendants actually and substantially caused Plaintiff's injuries and damages.

## JURISDICTION AND VENUE

14. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA and under CAVRA.

4

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district and because the CAVRA cause of action permits this lawsuit to be filed in any suitable United States District Court.

## SEX TRAFFICKING OVERVIEW

16. Human trafficking is a widespread and heinous crime that has deeply scarred the moral fabric of society. Often referred to as modern-day slavery, it represents a severe public health crisis of epidemic proportions. This exploitation disrupts communities, drives criminal activity, and devastates countless families. Each year, millions of people are trafficked across the globe, including within and into the United States.

17. One of the most harmful and destructive forms of human trafficking is sex trafficking. This involves using force, fraud, or coercion to force an individual into engaging in commercial sex acts. Even if no force, fraud, or coercion is involved, the exploitation of a minor for commercial sex is human trafficking.

18. Sex trafficking represents a large part of global human trafficking and is the predominant form of transnational modern-day slavery. It is estimated that 4.8 million people are victims of sex trafficking worldwide, with the United States being the leading country in driving demand.

19. Women and girls are disproportionately impacted by this modern form of involuntary servitude, making up 99% of victims in the commercial sex industry. Within the realm of sex trafficking, children are undoubtedly the most vulnerable. According to research from the Polaris Project, the average age at which sex trafficking begins is during adolescence, though disturbingly, it can start as early as infancy.

20. In 2018, more than half (51.6%) of active criminal human trafficking cases in the United States involved sex trafficking of children only. According to the National Center for Missing and Exploited Children, reports of suspected child sex trafficking increased by 846 percent between 2010 and 2015. A survey found that in 2015, 55 percent of minors who became victims of sex trafficking met their traffickers through a website or mobile

5

app. Increasingly, predators use the internet and social media to identify, target, and exploit vulnerable children.

21. The harms suffered by victims of sex trafficking are profound and extensive. Victims are routinely subjected to sexual violence, physical abuse, and repeated criminal exploitation, often by multiple offenders. They are frequently forced to endure extreme physical deprivation, including inadequate food, sleep, and medical care, and are exposed to serious health risks such as HIV/AIDS, hepatitis, and substance dependency. Psychological consequences are pervasive and severe, including depression, post-traumatic stress disorder, anxiety, and persistent fear. Survivors often experience cognitive and memory impairments, engage in self-destructive behaviors, and face social marginalization that intensifies the lasting impact of their victimization.

22. Traffickers employ illicit schemes, intricate networks of corporate entities, and rapidly evolving technologies to carry out their operations. More than a decade ago, human trafficking was identified as the third-largest and fastest-growing criminal enterprise worldwide, driven by the combination of high profits and relatively low risk.

23. Human trafficking produces an estimated $150 billion in profits each year, approximately two-thirds of which stem from the sexual exploitation of trafficked individuals.

24. While traditional trafficking methods persist, online technologies now give traffickers an unprecedented ability to exploit larger numbers of victims and advertise across geographic boundaries. The rise of online exploitation has fundamentally transformed the commercial sex trade. Where buyers once had to leave their homes to engage in in-person transactions, the internet now enables remote access and anonymity. Online advertising has reshaped the commercial sex market and, in doing so, has contributed significantly to the growth of domestic sex trafficking.

25. The exploitation of sex trafficking victims is not confined to traffickers and sex buyers alone; rather, human trafficking enterprises rely on the participation of ostensibly legitimate businesses to operate effectively. Traffickers understand that the viability of their operations often depends on access to and affiliation with mainstream commercial enterprises. When such businesses place profits above human welfare and become

complicit, they facilitate continued exploitation and enable traffickers to adapt, innovate, and expand methods for profiting from the exploitation of human beings.

26. There is little question that sex trafficking operations cannot succeed without the assistance, support, or facilitation of other business organizations. Human trafficking is therefore accurately understood as a criminal enterprise that relies on mainstream commercial partners to flourish.

27. In recent years, traffickers have increasingly relied on a broad array of willing accomplices, including ostensibly legitimate businesses that knowingly profit from commercial relationships with trafficking ventures they know—or reasonably should know—are associated with the exploitation and misuse of human beings.

28. Private-sector involvement in human trafficking is pervasive. Traffickers utilize lodging establishments to house victims and carry out forced commercial sex acts, rely on financial institutions to process and launder proceeds, and exploit internet and social media platforms to recruit victims and market their services. Criminal organizations also engage financial and legal entities to structure and manage their operations. Technological advancements in computing, software, and digital infrastructure further enable trafficking enterprises and enhance their profits.

29. For decades, sex traffickers have operated openly within hotels and motels throughout the United States. Throughout this period, traffickers conducted their activities on hotel properties while major hospitality corporations failed to take reasonable action to prevent or disrupt trafficking. Instead, many hotels and motels limited their responses to nominal anti-trafficking initiatives while continuing to collect substantial profits from trafficking occurring on their premises.

30. In fact, hotels constitute the primary locations in which sex trafficking takes place. This prevalence is not coincidental. For years, traffickers have exploited hotels as low-risk, high-profit environments. In 2014, 92 percent of reports to the Human Trafficking Hotline involved allegations of sex trafficking occurring in hotels. Moreover, hotels have been found to account for over 90 percent of the commercial sexual exploitation of children.

31. The hotel industry, including Defendants, derives substantial profits from participation in ventures that they knew or should have known were engaged in conduct violating 18 U.S.C. § 1591(a). Such participation includes renting hotel rooms used to harbor sex trafficking victims on a recurring basis and providing internet services that traffickers utilize to advertise and solicit victims for commercial sex acts. This arrangement constitutes a mutually beneficial relationship between Defendants and traffickers, sustained by the sexual exploitation of victims.

32. In light of the established link between hotels and sex trafficking, government agencies and nonprofit organizations, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, various state Attorney Generals, Love 146, EPCAT, among others, have undertaken extensive efforts to educate the hotel industry, regarding best practices for identifying and responding to trafficking. Indicators of sex trafficking in hotel environments are well documented, follow consistent patterns, and are readily detectable by appropriately trained personnel. Comprehensive, hotel-specific toolkits have been developed to enable staff at all levels to recognize and respond to trafficking indicators. Throughout a guest's stay—from check-in to check-out—traffickers and victims display recognizable warning signs.

33. Industry participants have access to substantial publicly available information concerning the prevalence of human trafficking in hotel settings, including industry-focused reports prepared by organizations such as the Polaris Project.

34. Education and training are among the most effective means of preventing and combating sexual exploitation and human trafficking. As ECPAT concluded: "The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property."

8

35. This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained." In reference to hoteliers, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

36. The well-known and pervasive relationship between sex trafficking and the hotel industry necessarily informs what Defendants knew or should have known about the trafficking of Plaintiff at Defendants' hotel.

37. Addressing the widespread growth of human trafficking requires accountability for those who knowingly profit from participation in ventures that a reasonable person knew or should have known were engaged in human enslavement. Civil litigation, therefore, serves as a critical tool in any comprehensive approach to combating sex trafficking in America.

## STATEMENT OF FACTS

**Plaintiff was Trafficked**

38. When she was just 16, Plaintiff was introduced to an adult man who went by the alias "ES". ES initially presented himself as a romantic suitor, someone who could help her escape the "control" of her family. They wanted her to live at home and go to school.

39. ES acted as a **"Romeo pimp",** a type of human trafficker who uses emotional manipulation and the illusion of a romantic relationship to lure and entrap victims into exploitation. This method relies on psychological grooming rather than immediate physical force. ES initially asked Plaintiff to do him "favors", to "honor" him, and in so doing perform commercial sex acts for money.

40. Plaintiff's trafficker posted advertisements on Backpage.com offering Plaintiff, a minor, for commercial sex acts in Kentucky and Tennessee. These advertisements included

photographs of Plaintiff and descriptions of sexual services available for purchase. Buyers responded directly to these advertisements and arranged meetings at hotel rooms rented by her trafficker. ES would communicate with clients as if he were Plaintiff, controlling all communication.

41. Plaintiff was trafficked out of many hotels, but the base of operations was the Days Inn by Wyndham Memphis at Graceland, located at 3839 Elvis Presley Blvd. Memphis, Tennessee.

42. This hotel provided the physical locations where Plaintiff's trafficking was carried out repeatedly and systematically, over a period of approximately three years, until Plaintiff was 19 years old. Plaintiff's trafficker would have a stream of "buyers" going directly from their vehicles to the already occupied rooms. Sometimes as many as a dozen buyers would come and go, spending a little as 30 minutes in the room. ES would typically sit in his car, right outside the hotel room, waiting for the buyer to depart the hotel room, whereupon he would enter the hotel room to retrieve the money. Throughout these stays, visitors arrived at all hours of the day and night. The conditions were such that nobody could feign ignorance of the conditions.

43. The trafficker transported Plaintiff to rooms at the hotel for the purpose of engaging in unlawful commercial sex acts with adult men in exchange for money. Her trafficker also used the location to provide Plaintiff with drugs and alcohol. The hotel rooms were not incidental to the trafficking venture; they were essential instrumentalities that enabled buyers to access Plaintiff in a private, enclosed, and commercial setting.

44. Plaintiff was repeatedly brought to this hotel under the control of her trafficker. Plaintiff remained under constant supervision and control by her trafficker, as he observed from his vehicle. She could not move freely about the property or communicate directly with hotel staff, even though she spent weeks continuously located at a single location.

45. The pattern was consistent and repetitive. The same type of activity occurred during multiple stays at this property, creating a sustained and observable course of conduct indicative of sex trafficking over a three-year period.

10

46. The Defendant hotels provided anonymity, minimal scrutiny, and convenient access for buyers responding to online advertisements. The layout and operation of the properties allowed a steady stream of unrelated adult men to access Plaintiff's room with little to no interference.

47. Inside the hotel rooms, Plaintiff was compelled to engage in commercial sex acts through psychological coercion, drugs and alcohol, and emotional pressure, intimidation, and control, which was specific to her naïve expectations of a romantic partnership.

48. Plaintiff did not consent to these acts. The hotel rooms served as the primary sites of repeated sexual assault and exploitation over an extended period of years which continued into adulthood.

49. Defendants knew or, at a minimum, should have known that Plaintiff was being subjected to sex trafficking on their premises. Despite these red flags, rooms continued to be rented, payments were accepted, and no meaningful intervention occurred.

50. By continuing to rent rooms under these circumstances, Defendants provided substantial assistance to the trafficking venture and financially benefited from the repeated commercial exploitation of a minor on their property.

51. As a direct and proximate result of being trafficked as a minor at these Defendant hotel locations, Plaintiff suffered severe and lasting physical and psychological injuries. Beyond the physical harm, Plaintiff continues to suffer profound emotional trauma, psychological injury, and lasting relational damage stemming from prolonged sexual exploitation during her adolescence.

52. There were overt and obvious signs of Plaintiff's trafficking, including the constant foot traffic of adult men coming and going, Plaintiff propping open doors (because she rarely had a room key), requesting access to rooms without identification, regular contact with house cleaning staff, and discussions related to the business being operated out of the hotels.

53. Plaintiff exhibited clear indicators of trafficking in her interactions with her traffickers, hotel staff, and others, including a nervous and fearful demeanor; signs of paranoia and disorientation; refusal to make eye contact;; inability to move freely throughout the hotel

11

or communicate independently; and submissive behavior, including seeking permission from her trafficker for basic needs and allowing traffickers to speak on her behalf.

54. These indicators matched well-recognized "red flags" of human trafficking in the hotel industry and were known to each Defendant to be signs of sex trafficking in a hotel environment.

**Sex Trafficking at Wyndham properties**

55. The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting child sex exploitation at Wyndham properties. Although the Wyndham brand publicly committed to taking steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[6]

56. In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[7]

57. Information that has become public through news stories establishes the entrenched and pervasive nature of the Wyndham Defendants' role in providing a venue where sex trafficking has continued unabated for years. Upon information and belief, Wyndham monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham branded hotels, including:

---

[6] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

[7] https://endsexualexploitation.org/wyndham/

58. In 2010, a California man was arrested for trafficking a 16-year-old victim after being spotted by law enforcement with the minor at a Wyndham property hotel in California.[8]

59. In 2011, a man was sentenced to life for child sex trafficking for requiring a minor to perform commercial sex services more than 50 times over a 14-day period at a Wyndham property hotel.[9]

60. In 2011, an MS-13 gang member was indicted for trafficking girls at a Wyndham property hotel Motel near Washington, D.C.[10]

61. In 2012, four were indicted after forcing a 24-year-old woman to engage in commercial sex at Ohio hotels, including a Wyndham property hotel.[11]

62. In 2012, a man was arrested for attempting to entice a 15-year-old girl to engage in prostitution at a Wyndham property hotel Motel in Oklahoma.[12]

63. A man was sentenced to 21 years in prison for sex trafficking his 16-year-old girlfriend starting in August 2013 at two hotels in Dallas, including a Wyndham property hotel Motel.[13]

64. In 2013, a man was arrested at a Wyndham property hotel in Rhode Island and charged with trafficking a 17-year-old girl at the motel.[14]

65. In 2013, a Wyndham property hotel motel in Massachusetts was searched and a man was charged with sex trafficking of a 17-year-old developmentally disabled girl after staying with her at that hotel.[15]

---

[8] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

[9] https://www.fbi.gov/jacksonville/press-releases/2011/ja011011.htm.

[10] https://www.thepublicdiscourse.com/2011/10/4034/

[11] https://www.10tv.com/article/news/crime/crime-tracker/four-indicted-first-human-trafficking-case-franklin-county/530-36f713e6-5488-4465-90c0-7eb99504a635

[12] Man faces new sex-trafficking charges, Tulsa World (Oklahoma) (March 9, 2013) https://plus.lexis.com/api/permalink/a9062a1a-76b4-4811-89ab-5b0b3c877a88/?context=1530671

[13] https://www.ice.gov/news/releases/dallas-gang-member-sentenced-21-years-federal-prison-child-sex-trafficking-conviction

[14] https://turnto10.com/archive/new-details-in-ardrey-sex-trafficing-investigation

[15] https://www.cbsnews.com/news/mo-man-located-with-missing-mass-teen-charged-with-sex-trafficking-report-says/

66. In 2013, two pled guilty to sex trafficking charges after forcing a child to engage in commercial sex at Wyndham property motel in Texas.[16]

67. In 2014, a sex trafficking task force arrested four in a Portland area sweep of a Wyndham property hotel.[17]

68. In 2014, a man was charged in connection with a Lansing, MI-based sex trafficking ring involving four 15 to 18-year-old girls who would meet customers at the Super 8 in Lansing.[18]

69. In 2015, a Texas man was arrested and charged with human trafficking and second-degree kidnapping after a woman said she was forced to perform sexual acts and was being held against her will at a Baton Rouge Wyndham property hotel.[19]

70. Reviews of Wyndham branded properties, which upon information and belief the Wyndham Defendants monitored regularly, also show both the pervasiveness of sex trafficking at their branded properties and the Wyndham Defendants' knowledge of same.

71. For example, an August 2008 review of a Wyndham branded property in Arizona states: "Woke in middle of night (2:30am) with loud party on 2nd floor with bodies slamming into walls, and looked out window to see hooker and pimp making deal with another man in pickup in the parking lot."[20]

72. A February 2010 review of a Wyndham branded property in Los Angeles, California states: "This place lacks security and there were drug dealers trying to push their products inside of the hotel. This place is Scary. The neighborhood was frightening and there were also prostitutes and homeless/addicts all over the place and renting rooms in the hotel. The desk guy looked at my friends attire (faux fur coat) and assumed he was a pimp and

---

[16] https://www.chron.com/news/article/two-plead-guilty-to-child-sex-trafficking-5000132.php

[17] https://www.pressherald.com/2014/03/03/sex_trafficking_task_force_arrests_4_in_portland_area_prostitution_sting/

[18] https://www.lansingstatejournal.com/story/news/local/2014/11/20/witnesses-face-lansing-man-charged-sex-trafficking-ring/70010754/

[19] https://www.wafb.com/story/29240032/texas-man-charged-with-human-trafficking-kidnapping-in-baton-rouge/

[20] https://www.tripadvisor.com/ShowUserReviews-g60950-d74409-r21067299-Super_8_by_Wyndham_Tucson_Downtown_Convention_Center-Tucson_Arizona.html

14

that we were prostitutes and seemed surprised that we had made reservations for more than one night. He kept giving us this strange smile ... icky. This place left me with a bad feeling. If you want to stay here to save a few bucks my advice is to utilize the buddy system whenever you leave your room to visit the vending machines ... after checking in for the night that is probably the only thing you will feel even moderately safe doing. eek. I can deal with scary hotels but this place is a disaster waiting to happen."[21]

73. A June 2010 review of a Wyndham branded property in Virginia states: "The location is in a very unsafe place. There were junkies and prostitutes using the premises of the hotel."[22]

74. A July 2010 review of a Wyndham branded property in Texas states: "After a night out parking lot full had to park under drive thur in front of hotel no other space. Number One reason to not stay here HOOKERS!!! walking the parking lot, walking the sidewalks and feeder road roads in front of Motel. All hours of the day."[23]

75. An October 2011 review of a Wyndham branded property in Tennessee states: "Don't stay here unless you want drugs or a prostitute .... or both. There were drunks running up the halls all night and the maid offered to have sex with my husband for money. When he refused, she then offered to sell him pills."[24]

76. A February 2012 review of a Wyndham branded property in Florida states: "This hotel should not even be listed as a choice to stay in. Upon check, 3 rooms from me was a sexual battery crime scene. Prostitutes and drug deals were going on all over the property. The room was filthy, smelled horrible and I wouldn't even touch the bed! This hotel is a LIVE IN hotel for Prostitutes, drug dealers and gangs!!!!! DO NOT STAY HERE! !"[25]

---

[21] https://www.tripadvisor.com/ShowUserReviews-g32655-d235134-r56967752-Super_8_by_Wyndham_Hollywood_LA_Area-Los_Angeles_California.html

[22] https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-Norfolk:Chesapeake-Bay.h7202.Hotel-Reviews

[23] https://www.tripadvisor.com/Hotel_Review-g30196-d109015-ReviewsSuper_8by_Wyndham_Austin_North_University_Area-Austin_Texas.html

[24] https://www.tripadvisor.com/Hotel_Review-g55138-d97967-Reviews-or165-Super_8by_Wyndham_Knoxville_Downtown_Area-Knoxville_Tennessee.html

[25] https://www.tripadvisor.ie/ShowUserReviews-g34378-d113362-r125347054-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html

77. An April 2012 review of a Wyndham branded property in Texas states: "We have stayed in hotels all over the world and I have never had as terrible and frightening an experience as I had at this hotel. The place was crawling with prostitutes and seedy looking guys looking for prostitutes. We tried to stay here anyway, but the night manager started threatening us! In the end we had to call the police in order to safely leave. The police were very sympathetic, and apparently they have frequent problems with this hotel. Stay Away."[26]

78. An October 2012 review of a Wyndham branded property in Florida states: "the last time i stayed at this super 8, a hooker approached me in the parking lot and informed you . this time there was a drug dealer in the next door room, cars coming and going all day & night a car would pull up and one person goes inside and 5 minutes later comes out. when i was checking out i told the desk clerk and the girl in the office says oh i know who that is. well if you knew about why was he still there. i will never stay there again, and i'm a loyal super 8 customer."[27]

79. A February 2013 review of a Wyndham branded property in Minnesota states: "This hotel was disgusting. Homeless man passed out in lobby, possible prostitute hanging out in hallway with pimp, cigarette smell, ridiculous noise level throughout night, etc. Dirty shoes in microwave, empty beer cans in fridge. I cannot express enough how terrible this place really is."[28]

80. An April 2013 review of a Wyndham branded property in Georgia states: "The hotel was filled with prostitutes and drug dealers and I was put in the back with my children which gave me no type of security. Super 8 needs to remove their name from this building."[29]

---

[26] https://www.tripadvisor.com/ShowUserReviews-g56003-d240483-r128310734-Super_8_by_Wyndham_Houston_Brookhollow_NW-Houston_Texas.html
[27] https://www.tripadvisor.com/ShowUserReviews-g34378-d113362-r143852088-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html
[28] https://www.tripadvisor.com/ShowUserReviews-g43493-d247863-r153318041-Super_8_by_Wyndham_St_Cloud-Saint_Cloud_Minnesota.html
[29]https://www.tripadvisor.com/ShowUserReviews-g34856-d217054-r157802203-Super_8_by_Wyndham_Atlanta_Hartsfield_Jackson_Airport-College_Park_Georgia.html

81. These articles and reviews are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham hotels.

82. Moreover, on information and belief, Defendants are aware of additional significant law enforcement activity related to trafficking at their hotels that was not reported in the media.

83. Several reviews specific to the Days Inn by Wyndham Memphis at Graceland describe the presence of sex trafficking:

- In June of 2019, a customer left a review Kayak.com: "Pros (+) It was very accessible to where we were going.Cons (-) The room wasn't up to scratch considering the price, we had booked for 2 nights, our first night there we had gone to bed, and around 12pm there was a lot of noise from the room next door, loud voices & shouting a woman & a man,so we rang reception to complain & eventually we heard somebody knock on our door to say that the people in the next room had been spoken to, but the noise & shouting & swearing didn't stop all night, we could hear everything going on next door, around 7pm the next morning there was a knock next door another man arrived asking for money, from the other man, who offered him his mobile phone instead, which was refused, we had guessed there was a prostitute in the room because of what we had heard, we were totally disgusted & had not slept most of the night. We have reported this to The Days Inn, who eventually offered us money back, which we have yet to receive"

- In August of 2020, a customer left a review on Kayak.com: "Well, if your idea of a great hotel experience involves open drug deals, visible prostitution, and gun fire then this is the place to be! According to the locals, this is a normal occurrence."

- In September of 2020, a customer left a review on Kayak.com: The parking lot was filled with drug paraphernalia. People doing drugs outside of rooms. Dogs tied outside on posts as if people were living there. Stay away from this place !!!

- On September 24, 2020, a customer left a review on Yelp.com: " This place is a DUMP. I wish I had read the Yelp reviews before booking this place. Drug addicts, dog crap and garbage in hallways. Room is filthy. Toilet was gross. Still had a used

soap bar in the shower. "Non smoking" room smells like an ashtray. Walls are dirty. Even webs on ceiling. Elvis would be ashamed that his image is used all over this place. I thought Wyndham was a quality brand. Not anymore. Do not stay here!"

- In November of 2020, a customer left a review on Tripadvisor.com: "Blood, urine, hair, & black mold SEE PICTURES. We found soiled men's underwear and a lid to a needle behind the bathroom door. So effing nasty. Bedding had long black hairs, urine and blood. Clearly the bedding was not changed before our stay. The property is in is repair. Look at those walkways and stairs. Drug dealing and prostitution going on in room 104.Black mold in bathroom. Huge leak behind shower wall. The strong aroma of pot and cigarette smoke throughout the property. You can't get away from it. This by far was the worst property with the Wyndham name on it that we've ever stayed at. Wyndham should be embarrassed."

- About 5 years ago (2021), a customer left a review on Google.com: "Our honeymoon was ruined. This place is a dump. The characters around the hotel made me uncomfortable, getting our room: dirty furniture, drug paraphernalia in the corner of the room, mold EVERYWHERE, the bed felt like a marshmallow. I used a towel I bought with me to cover up with. We had a extremely long ride and got there late so we were tired and stayed. My husband and I are are getting ready to leave this dump and find another hotel. A wasted $284.00 breakfast was included which is not served but we would not have eaten it anyway, disgusting 😖

- In January of 2021, a customer left a review on Kayak.com: "Pros (+) HAD TO CHANGE ROOMS BECAUSE OF UNCLEAN AND SMELLED LIKE SMOKE ASK FOR NON SMOKING .I DID NOT LIKE ANY THING ABOUT THIS HOTEL IT WAS AN AWFULL DISGRACE TO ELVIS PRESLEY AND HIS MEMORY. NEVER WOULD RECOMMEND. Cons (-) DRUG DEALERS DRUG ADDICTS WALKING AND TALKING SETTING OUT IN CARS.LOUD MUSIC TRAPP HOTEL FOR DRUGS DANGEROUS. I HAVE USED PICK 3 BEFORE AND THIS WAS THE WORSE OF THE 3 EVER. IF YOU WANT MY BUSINESS NEVER MAKE THIS ONE MY CHOICE"

18

- In March of 2021, a customer left a review on Tripadvisor website saying, "Worst ever! This motel was disgusting dirty, bathroom walls smeared with what looked like feces, room smelled of cigrettes alarming about of foot traffic. Encountered what appeared to be a prostitute early morning check out."

- In April of 2021, a customer left a review on Tripadvisor: "Please don't stay here dangerous Please don't stay here dangerous I rate my stay a 0. This is because the noise, drug selling, prostitution, and guns. I was scared entering and leaving the room. I got no sleep due to the activity all night til 6am. I also had the front desk call the police. Someone was also making threats about shooting someone."

- On August 17, 2021, a customer left a review on Yelp: "This place was filthy! The towels were stained, the sheets were stained, burn marks all over the furniture and sheets. the bathroom door has been kicked in and no longer closed. the bathroom was so dirty it was completely unusable. People were selling Drugs in the parking lot. There were roaches everywhere. When we entered the room the TV was already on. We immediately left and they refused to refund our money."

- In November of 2021, a customer left a review on Kayak.com: "Pros (+) There was no breakfast as you advertised. Cons (-) Didn't like a thing. It was filthy broken down closet no telephone no hangers no pictures on wall they were laying in closet. There was a pimp with his girls next to us he tried to break day his door. It was very scary as we are older women I would like a refund and I will let people know about booking.com respond to this problem I complained to the hotel also. I have plenty of photos too."

- In September of 2022, a customer left a review on Tripadvisor: "Drugs and prostitution ! Stayed here every year for the last 8 years before covid and always enjoyed the basic but friendly hotel. This trip there is no reception you have to book in through a window. No breakfast even though it was part of the deal. The room was disgusting. Dirty and dusty with a strong smell of marijuana. The bathroom was filthy and the bath tub cracked in several places. Broken furniture so nowhere to hang our clothes. Bedding was damp and ripped. We had to go out and buy bacterial wipes to

clean the room. Barely any housekeeping we had to go to reception for toilet rolls and fresh towels. The safe as well as the smoke alarm didn't work and we are pretty sure the cctv doesn't work because on the 26th cars were broken into in the car park. We witnessed prostitutes and drug deals and night before last the police raided the hotel. Staff are fine and pool is clean although the pool area isn't. Whoever owns this hotel is nothing more than a slum landlord. The whole place needs serious refurbishment. Worst hotel I've ever been in by a million miles. Avoid."

- In October of 2022, a customer left a review on Tripadvisor :"Terrible Hotels We arrived for a 5 day stay, was so shocked by the condition of our room. The bed was nothing short of disgusting with stains everywhere. The room smell was of drugs. I even found a mouldy chip on the floor, I would not let my dog sleep there. Total misrepresentation from their website photos. In fact we checked out immediately and found alternative hotel. The local taxi driver then advised that this is a local drug dealer and prostitution hotel, and has been like this for years. Save your money do not book this hotel. I have given 1 star for the hotel receptionist, otherwise it would be 0 stars."

- In April of 2023, a customer left a review on Tripadvisor website saying," AVOID AVOID AVOID" We booked here as was close to Graceland so as far as location goes it's great! That is the ONE and only thing good about this place. We checked in at 4pm and left at 6pm. Drug deals going on in back car park, attempt break in to our car at 5.30pm, asked if we had or wanted drugs. Room disgusting, no cups or coffee for machine, no plug for the bath, Tv didn't work, air on sounded like a steam train, fridge was so loud too!! We booked the Graceland guest house down the road and left this hotel immediately as didn't feel safe whats so ever. The guy on reception was more interested in talking on his phone that dealing with customers. AVOID AVOID AVOID!!!

- In January of 2024, a customer left a review on Tripadvisor : "Worst place ever. If I could give this a zero rating I would. Horrendous hotel, we stayed for 1hr and left!

Drug deals and prostitution in the back car park - cars broken into nightly. Staff rude, room awful with broken bed, toilet etc. Do not stay here AVOID AVOID AVOID

- On November 22, 2025, a customer left a review on Days Inn by Windham website saying: "That hotel should not b there. Encounter a call girl right off the bat. Made us very uncomfortable. Glad there only one night."

84. These articles, news stories, guest surveys, and online reviews show that the use of Wyndham hotels for sex trafficking was not isolated to one hotel property or a single geographic area. The common use of Wyndham hotels for sex trafficking became a nationwide problem that stemmed from decisions made at the corporate/franchisor level.

85. Defendants knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at Wyndham branded hotels, including the subject hotel, and while Defendants claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the subject hotel frequently and long before and after the trafficking of the Plaintiff.

**Actual and Constructive Knowledge**

86. At all relevant times, the defendants knew or should have known that sex trafficking was prevalent at their hotels because the trafficking occurred openly on these premises, followed well-established patterns, and presented with obvious indicators that Defendants recognized and acknowledged as signs of sex trafficking in a hotel environment.

87. Upon information and belief, Plaintiff's trafficker, along with other traffickers, repeatedly selected these locations to conduct sex trafficking activities because their policies and practices created a favorable environment for trafficking and because hotel staff routinely ignored or failed to act on clear indicators of trafficking. As a result, traffickers were able to operate with minimal effort to conceal their activities, based on an implicit understanding that their conduct would not be questioned or disrupted by the hotels.

88. Moreover, numerous trafficking "red flags" were observed by hotel staff and management at both locations. These indicators included, among others, payment in cash

or prepaid cards; unusually high volumes of men, who were not registered guests, entering and exiting rooms at all hours; extended stays despite arriving with few personal possessions; and other conduct consistent with the well-established indicators of sex trafficking described above.

89. During the period that Plaintiff was trafficked, there were obvious signs that her trafficker was engaged in sex trafficking:

- Plaintiff's trafficker or a "buyer" would pay for the room with cash or prepaid credit cards.

- Plaintiff would appear to be with a significantly older "boyfriend" and have lower quality clothing compared to the males she was with.

- At check-in, the hotel staff observed Plaintiff exhibit evidence of being verbally threatened and emotional abuse.

- Plaintiff would have few or no personal items when checking in.

- Plaintiff would often be dropped off at the hotel by her trafficker.

- Plaintiff could be seen loitering on the property and appearing to monitor the area.

- Plaintiff had heavy foot traffic of non-hotel guests and older males coming from the room she was trafficked in.

- The "Do Not Disturb" door hanger was used very frequently.

- After Plaintiff checked out, the hotel cleaning staff noticed large amounts of sex paraphernalia, like condoms and lubricant, in the trash.

- Plaintiff prevented housekeeping staff from entering the room for regular cleaning.

90. Other obvious signs of trafficking consistent with the modus operandi of her trafficker, which included well-known "red flags" for trafficking in a hotel.

91. Employees at these hotels, including management-level employees, observed or were made aware of these obvious signs of Plaintiff's trafficking while acting within the scope and course of their employment.

92. As such, the defendants knew or were willfully blind to the fact that Plaintiff was being trafficked at the subject hotels.

22

93. Given these obvious signs, defendants knew or should have known about the trafficking activity that resulted in the trafficking of Plaintiff.

94. The defendants also knew or should have known about the trafficking of Plaintiff based on the numerous tools through which they monitored and supervised the subject hotels.

95. If the defendants had exercised ordinary prudence in areas of operations over which they retained control or in which they directly participated, they would have detected and stopped benefiting from the illegal activities of Plaintiff's traffickers at the subject properties.

96. The hotel staff and the franchisees also facilitated widespread trafficking at the properties, including the trafficking of Plaintiff in ways including, on information and belief:

   a. developing a relationship with Plaintiff's trafficker, and creating an understanding that she could operate at the hotel without risk of interference;

   b. continuing to provide rooms, services, and assistance to the trafficker in the face of obvious "red flags" of trafficking of Plaintiff and other victims;

   c. accommodating specific requests made by traffickers;

   d. serving as lookouts for traffickers;

   e. accepting bribes from the trafficker;

   f. observing Plaintiff in obvious distress but continuing to provide support to her trafficker;

   g. allowing "buyers" who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking;

   h. using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

   i. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

   j. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their

activities, but, instead, could operate without concern for detection or interference by the hotel staff;

k. providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

97. The defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Plaintiff.

98. The defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**Wyndham Franchisor and Franchisee Relationship**

99. The Wyndham Defendants are responsible for the acts, omissions, and knowledge of all employees of the Days Inn Wyndham Memphis at Graceland named in this suit when operating the hotels because these acts and omissions were committed in the course and scope of employment, because the Wyndham Defendants ratified these acts and omissions, and because the Wyndham Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to the Wyndham Defendants, of sex trafficking occurring at Wyndham branded locations including the subject Days Inn Wyndham Memphis at Graceland.

100. Upon information and belief, the Wyndham Defendants participated directly in aspects of the operation of the Subject Days Inn Wyndham Memphis at Graceland that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Plaintiff, as follows:

a. The Wyndham Defendants have publicly assumed responsibility and control over the human trafficking response of all Wyndham properties, including the Subject Days Inn Wyndham Memphis at Graceland, including design and implementation of

practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

b. The Wyndham Defendants retained control over when its branded hotels, including the Subject Days Inn Wyndham Memphis at Graceland, would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in Wyndham branded hotels;

c. The Wyndham Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the Wyndham Defendants.

d. The Wyndham Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement.

e. The Wyndham Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity.

f. The Wyndham Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

g. The Wyndham Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Wyndham Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

h. Although they delayed making any reasonable effort to do so, the Wyndham Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

i. The Wyndham Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential

25

criminal incidents at all Wyndham properties, including suspected trafficking incidents;

j. The Wyndham Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the Subject Days Inn Wyndham Memphis at Graceland;

k. The Wyndham Defendants maintained control over all details of the terms under which franchised hotels, including the Subject Days Inn Wyndham Memphis at Graceland, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Wyndham Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the Subject Days Inn Wyndham Memphis at Graceland;

l. The Wyndham Defendants retained control over the setting, supervision, oversight, and enforcement of detailed policies and protocol for housekeeping services at the Subject Days Inn Wyndham Memphis at Graceland, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

m. Wyndham Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the Subject Days Inn Wyndham Memphis at Graceland, including trends that would reveal patterns consistent with human trafficking.

101. The Wyndham Defendants directly participated in and retained day-to-day control over renting rooms at the Subject Days Inn Wyndham Memphis at Graceland location by, among other things:

102. The Wyndham Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

26

103.    The Wyndham Defendants directly made reservations for rooms at the Subject Days Inn Wyndham Memphis at Graceland and accepted payment for those rooms through a central reservation system that they controlled and operated. The Wyndham Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement;

104.    The Wyndham Defendants established and maintained control over a brand-wide "do not rent" system. The Wyndham Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the Subject Days Inn Wyndham Memphis at Graceland through detailed policies that it established regarding use of this "do not rent" system;

105.    The Wyndham Defendants controlled room rates, required discounts, mandatory fees, and a rewards program;

106.    The Wyndham Defendants controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation;

107.    The Wyndham Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

108.    The Wyndham Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Subject Days Inn Wyndham Memphis at Graceland;

109.    The Wyndham Defendants established detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the Subject Days Inn Wyndham Memphis at Graceland until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room, and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

110.    The Wyndham Defendants required franchisees to use Wyndham's property management system, which was owned, maintained, controlled, and operated by the

27

Wyndham Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

111.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Days Inn Wyndham Memphis at Graceland, the Wyndham Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (A.L.H.).

112.     The Wyndham Defendants are vicariously liable for the acts, omissions, and knowledge Franchisee Defendant and the staff at the Subject Days Inn Wyndham Memphis at Graceland, which are the Wyndham Defendants' actual agents or subagents.

113.     The Wyndham Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Days Inn Wyndham Memphis at Graceland through the franchising agreement, detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Defendants.

114.     The Wyndham Defendants obscure the full extent of control they exercise over Franchisee Defendant by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals.  Upon information and belief, the standards that the Wyndham Defendants imposed on Franchisee Defendant:

   a. Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Subject Days Inn Wyndham Memphis at Graceland;

   b. Covered virtually all aspects of hotel operations, including internal operating functions;

   c. Dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the Subject Days Inn Wyndham Memphis at Graceland; and

   d. Significantly exceeded what was necessary for the Wyndham Defendants to protect their registered trademarks.

28

115.     In addition to the ways described above, upon information and belief, the Wyndham Defendants exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the Subject Days Inn Wyndham Memphis at Graceland, including the following ways:

a. The Wyndham Defendants required Franchisee and management of the Subject Days Inn Wyndham Memphis at Graceland to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Wyndham Defendants to protect their registered trademarks;

b. The Wyndham Defendants provided training for hotel management and select hotel staff on-site at the Subject Days Inn Wyndham Memphis at Graceland and at locations selected by the Wyndham Defendants;

c. The Wyndham Defendants required all hotel staff to participate in training they created through an online learning platform they controlled and maintained;

d. The Wyndham Defendants controlled training provided by Franchisee to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. The Wyndham Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that Franchisee was required to purchase to operate the Subject Days Inn Wyndham Memphis at Graceland, the Wyndham Defendants designated approved vendors and prohibited Franchisee from purchasing goods and services from anyone other than an approved vendor;

g. The Wyndham Defendants required Franchisee to sign a technology agreement governing the terms under which Franchisee must procure and use technical services and software while operating the Subject Days Inn Wyndham Memphis at Graceland. Franchisee was required to install and use certain brands, types, makes,

and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h. The Wyndham Defendants set required staffing levels for the Subject Days Inn Wyndham Memphis at Graceland;

i. The Wyndham Defendants established detailed job descriptions for all positions at the Subject Days Inn Wyndham Memphis at Graceland and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. The Wyndham Defendants set requirements for the hiring process used by Franchisee and oversaw employee discipline processes and termination decisions;

k. The Wyndham Defendants provided benefits for employees of Franchisee;

l. Wyndham Defendants required Franchisee to use a customer resource management program maintained and operated by the Wyndham Defendants;

m. The Wyndham Defendants controlled channels for guests to report complaints or Provide feedback regarding the Subject Days Inn Wyndham Memphis at Graceland and directly participated in the response and/or supervised the response to customer complaints or other feedback.

The Wyndham Defendants retained the right to provide refunds or other compensation to guests and to require Franchisee to pay associated costs;

a. The Wyndham Defendants generated reports and analysis of guest complaints and online reviews for the Subject Days Inn Wyndham Memphis at Graceland;

b. The Wyndham Defendants required Franchisee to use a Guest Relations Application owned, operated, and maintained by the Wyndham Defendants to manage all guest data and information. The Wyndham Defendants could use the backend of this system to analyze data and generate reports;

c. The Wyndham Defendants set detailed requirements for insurance that Franchisee must purchase and retained the right to purchase insurance for Franchisee and to bill Franchisee directly for that insurance if the Wyndham Defendants determined that Franchisee has not purchased adequate insurance;

30

d. The Wyndham Defendants regularly audited the books and records of Franchisee;

e. The Wyndham Defendants conducted frequent and unscheduled inspections of the Subject Days Inn Wyndham Memphis at Graceland;

f. The Wyndham Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if Franchisee violated any of the Wyndham Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Subject Days Inn Wyndham Memphis at Graceland;

g. The Wyndham Defendants controlled all marketing for the Subject Days Inn Wyndham Memphis at Graceland and prohibited Franchisee from maintaining any online presence unless specifically reviewed and approved by the Wyndham Defendants;

h. The Wyndham Defendants imposed detailed recordkeeping and reporting requirements on Franchisee regarding virtually all aspects of hotel operations;

i. The Wyndham Defendants supervised and controlled day-to-day operations of the Subject Days Inn Wyndham Memphis at Graceland through detailed information and extensive reports that they obtained through the property management system and other software systems they required Franchisee to use; and

j. The Wyndham Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

116. Under the TVPRA, Defendants are jointly and severally liable for all damages a jury awards to Jane Doe for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking at the Subject Days Inn Wyndham Memphis at Graceland.

## FIRST CAUSE OF ACTION: TVPRA

Trafficking Victims Protection Reauthorization Act ("TVPRA")

18 U.S.C. § 1595 (against all defendants).

117.     The civil remedy provision of the federal human trafficking statute is found at 18 U.S.C. § 1595, and it reads:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter123) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

118.     Thus, the federal sex trafficking statute consists of four elements: (a) the defendant knowingly benefited, (b) from participation in a venture, (c) the venture violated the TVPRA, and (d) the defendant knew or should have known the venture violated the statute.

**Claim 1: Wyndham and Anju Inc. Liability**

**Knowingly Benefited**

119.     The Wyndham defendants and Anju Inc. knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

**Participation in a Venture**

120.     The Wyndham defendants and Anju Inc. fully participated in the commercial venture of renting rooms to Plaintiff's traffickers.

121.     Moreover, the Wyndham defendants were involved in a business venture with Anju Inc. to operate a hotel and rent rooms.

**The Venture Violated the TVPRA.**

122.     The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

123.     Defendants were well aware of the prevalence of sex trafficking generally at their hotels, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking, gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.

**Vicarious Liability**

124.     The Wyndham Defendants exercise of day-to-day control over the Wyndham properties in this lawsuit, including requiring the franchisees to, among other things: (1) use its property management system; (2) use their centralized reservation system; (3) submit to periodic inspections with threat of termination; (4) gather reservation, payment, and occupancy data through their centralized system; (5) use approved Wi-Fi and security vendors; (6) comply with their regulated room rental rates; (7) share of profits; (8) control training and policies; and (9) adhere to other brand standards and corporate policies with respect to ethics and safety, demonstrates sufficient control over the franchisee to demonstrate an agency relationship and vicarious liability for the actions of the franchisees.

**SECOND CAUSE OF ACTION: CAVRA**

Child Abuse Victims Rights Act ("CAVRA")

18 U.S.C. § 2255 (against all defendants)

125.     Federal law provides civil remedies for victims of child exploitation by way of a statute commonly referred to as "Masha's Law." The statute provides a cause of action for minors who were victims of a violation of enumerated federal laws, including 18 U.S.C. § 1591.

126.     Defendants knowingly benefited from harboring Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her trafficker rooms in hotels that they own, operate, and oversee, under the circumstances where they knew that Plaintiff, a minor, would be engaged in commercial sex acts.

127.     Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

**THIRD CAUSE OF ACTION: NEGLIGENCE**

(against all defendants)

128.     These defendants have a heightened duty of care to invitees, such as Plaintiff, who stay at their hotels.

129.     As alleged above, sex trafficking was a reasonably foreseeable occurrence at the defendants' hotels from their knowledge and past experiences that persons on the premises would suffer serious bodily harm as a result of being victimized by crimes perpetrated by third parties on the premises and that they should have known for more than a decade that sex trafficking runs rampant at their motels.

130.     Additionally, the franchisors are vicariously liable for the negligence of its agents and franchisees.

**PRAYER FOR RELIEF**

Plaintiff prays for judgment to be entered for Plaintiff against Defendants, jointly and severally, for the actual, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, attorneys' fees, and such other and further relief to which Plaintiff may show herself to be justly entitled, at law or in equity.

**JURY DEMAND**

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury on all the issues so triable.

By: /s/ *Penny L. Barrick*
Penny L. Barrick, (0074110)
Steven C. Babin, Jr. (0093584)
**Babin Law, LLC**
10 W Broad Street
Suite 900
Columbus, Ohio 43215
Phone: 614.761.8800
Direct: 614.372.6404
Cell: 614.747.6184
Fax: 614.706.1775
penny.barrick@babinlaws.com
steven.babin@babinlaws.com
*Counsel for Plaintiff*